**L.J., An Infant, By and Through His Next Friend, Lydia Kaye DARR, et al., Plaintiffs,**

v.

**Ruth MASSINGA, etc., et al., Defendants.**

**Civ. No. JH–84–4409.**

United States District Court, D. Maryland.

Sept. 27, 1988.

William L. Grimm, Ethel Zelenske, and the Legal Aid Bureau, Inc., Baltimore, Md., Carol R. Golubock, and the Children's Defense Fund, Washington, D.C., Nevett Steele, Jr., Ward B. Coe, III, and Whiteford, Taylor & Preston, Baltimore, Md., for plaintiffs.

J. Joseph Curran, Jr., Atty. Gen. of Maryland, Catherine M. Schultz and Mark J. Davis, Asst. Attys. Gen., Baltimore, Md., for defendants.

## MEMORANDUM

JOSEPH C. HOWARD, District Judge.

Pending before the court is this civil rights class action brought by foster children in the care and custody of the Baltimore City Department of Social Services ("BCDSS"). Named as defendants are Ruth Massinga, Secretary of Maryland's Department of Human Resources, BCDSS, and various foster-care officials. These children allege that the defendants' administration of the foster care system in Baltimore City violates their rights under federal statutory law, Titles IV–E and IV–B of the Social Security Act, and the Fourteenth Amendment to the United States Constitution. The class seeks equitable relief in the form of an affirmative injunction that would require reforms of the foster care system. In addition to these equitable claims, some named class representatives seek monetary damages for harms allegedly suffered while in the defendants' care.

The immediate matter under consideration is whether a consent decree proposed by the parties as settlement of the equitable claims is fair and adequate and thereby merits the court's approval.[1] After the proposed decree was submitted on April 26, 1988, the court met with the parties, directed that notice be provided the class members and interested persons, held a hearing at which those provided notice were invited to present objections or comments, and met with foster care workers to learn their views of the decree. After completion of these measures and careful study of the decree, the court approves the decree for the reasons provided below.

---

1. The full decree is attached as Addendum A to this Memorandum.

## I.

The history of this action is long and arduous. Since the complaint was filed in December, 1984, the court has issued over seventy orders and held a dozen status conferences with the parties. The docket, now seventeen pages long, lists over two hundred entries.

On January 2, 1987, the court granted a motion to intervene that had been filed the previous November by two additional proposed class representatives. That same day the court certified a class composed of all children who are, have been, or will be placed in foster homes by the BCDSS and are or will be placed in the custody of the BCDSS through voluntary placement or court order. On February 6, after conducting extensive discovery, including a random sampling of BCDSS foster care case records, the plaintiffs filed a motion for a preliminary injunction.

A hearing on the motion was held over a period of two weeks commencing on April 2, 1987. Some 91 separate items of evidence were introduced, and the court heard from 12 witnesses. Among the items of evidence were the preliminary results of plaintiffs' random sampling of case records, contained in several thick looseleaf binders. The witnesses included an expert on the research methodology used in conducting the plaintiffs' study.[2] The court also heard the testimony of relatives and experts regarding the cases of sixteen children who had been severely neglected and abused while in defendants' care and custody.

The court found overwhelming evidence of serious systematic deficiencies in Baltimore's foster care program such that foster children would suffer irreparable harm if immediate injunctive relief were not granted and, in a Memorandum and Order issued July 27, 1987, granted plaintiffs' motion for a preliminary injunction.[3] Specifically, among its findings, the court determined that there was a lack of satisfactory foster homes; that the defendants failed to remove children from homes where physical and emotional abuse and neglect were threatened; that homes were licensed where foster parents were unable to care properly for the children; that "exceptions" were granted allowing clearly inadequate homes to remain open; that the system for providing medical care to foster children was inadequate to ensure continuous and informed treatment; and that the defendants had substantially failed to undertake the improvements recommended by an internal study produced by the "Harris Task Force."

As preliminary injunctive relief, the defendants were ordered to (1) review the status of each foster home where there had been a report of maltreatment; (2) visit each child in a BCDSS foster home on a monthly basis; (3) visit each child who had been the subject of a report of maltreatment on a weekly basis; (4) assign sufficient staff and resources to ensure appropriate medical care was rendered and medical histories were obtained and provided to those rendering medical care to each child; and (5) provide a written copy of any complaint of maltreatment of a foster child to the juvenile court and the child's attorney.

On February 1, 1988, the Fourth Circuit affirmed this court's decision to grant plaintiffs a preliminary injunction. *See L.J. By and Through Darr v. Massinga,*

2. For a detailed review of the methodology used in plaintiffs' random sampling see the court's Memorandum and Order dated July 27, 1987, attached to this opinion as Addendum B.

3. The court also granted plaintiffs' motions for sanctions due to certain conduct of defendants' attorneys. Specifically, pursuant to Fed.R.Civ. P. 37(b)(2)(A) and 16(f), the court ordered it taken as established that defendants "fail to protect effectively children in foster homes where there is reason to know that such children are at risk of harm to their physical and emotional well-being." Having deemed these facts admitted, the court found plaintiffs also entitled to preliminary injunction on this alternative basis.

The court's Memorandum and Order dated July 27, 1987 has been attached to this memorandum as Addendum B. That memorandum has been edited to eliminate the court's detailed discussion of its basis for imposing sanctions because those facts do not serve as part of the basis for the court's determination of whether the decree is fair and adequate.

838 F.2d 118 (4th Cir.1988).[4] Thereafter, the parties engaged in extensive settlement negotiations. On April 26, 1988, approximately two and a half months prior to trial, the parties submitted the proposed settlement of plaintiffs' equitable claims now before the court. The consent decree that embodies the settlement retains substantially those measures ordered by the court as preliminary injunctive relief. It also seeks to make substantial improvements in several aspects of the foster care system including placing limits on the number of cases a worker may be responsible for, improving the system for providing medical treatment to foster children, providing assistance to natural parents that would allow children to remain with them thereby avoiding foster care where possible, and providing for a continuum of appropriate foster care placements including the recruitment of new foster homes. Different improvements are to be implemented at different times; however, all improvements are to be made within two years.

After preliminary study of the decree and meeting with the parties, the court determined that the decree was within the range of reasonableness and approved a "Notice of Proposed Settlement of Class Action" on May 19, 1988.

## II.

Under Fed.R.Civ.P. 23(e), notice of settlement of a class action "shall be given to all members of the class in such manner as the court directs." The court directed that the approved notice of settlement, which contained a detailed summary of the proposed decree, be sent to all foster parents, all relatives with whom children had been placed by BCDSS, and all biological parents of children who had been placed in foster homes or with relatives on or before June 8, 1988. The Court also ordered that the notice be posted at any BCDSS office frequented by foster parents or by the natural parents of foster children. The full notice of settlement also was mailed to the heads of organizations known to represent foster children or known to have an interest in foster care issues.[5]

In addition to the mailing and posting of the full notice, a court-approved abbreviated notice was published five times in four daily newspapers.[6]

The notices informed interested parties that they could object to the decree at a hearing held on July 18, 1988. Those interested in testifying at the hearing were told to submit written statements to the court by July 8; however, at the hearing all were invited to testify regardless of whether that requirement had been met.

At the hearing, a total of ten people testified. These included foster parents, natural parents, a spokesman for a union which represents some foster care workers, a former foster child, and the husband of a foster care worker. None of those who testified objected to the decree. The foster parents expressed concern about the system for providing medical services to foster children. The former foster child told the court that she had been abused and molested while she was in the defendants' care, and she asked the court to implement the decree as soon as possible. The union representative expressed concern with some provisions and omissions of the decree; however, he said that the union's foster care worker members generally supported the decree.

Both the union representative and the foster care worker's husband urged the court to meet privately with the foster care

---

4. In the same opinion, the Fourth Circuit also affirmed this court's ruling that the defendants were not entitled to qualified immunity as to plaintiffs' claims for damages. 838 F.2d at 123–124. On that issue, defendants have petitioned the Supreme Court for a writ of certiorari.

5. The Legal Aid Bureau of Maryland, whose lawyers serve as lead counsel to the class plaintiffs in this action, provides legal services to and represents the great majority of Baltimore's foster children. The notice also was mailed to the Office of the Superintendent of the Baltimore City Public School, the State's Attorney for Baltimore City, the Baltimore City Juvenile Court judge and masters and to organizations that provide medical care to foster children.

6. *The Baltimore Sun, The Baltimore Evening Sun, The Afro–American* and *The Daily Record.*

workers, who did not wish to express any criticisms publicly. So that the court could hear the views of the people who would implement the decree on a day-to-day basis, an off the record meeting with foster care workers was held on August 3, 1988, with counsel present.

During that meeting, the workers expressed several concerns. In particular, the foster care workers stated that they often travel hundreds of miles per month and asked that transportation aides be employed by BCDSS to assist them. They also said that a pool of temporary foster care workers should be available to assist when a worker is ill or on vacation. The foster care workers also asked that they be assured a role in the implementation and monitoring of the decree.

## III.

■ The court's approval of a proposed settlement is required in order to protect the interest of absent class members. *Piambino v. Bailey*, 610 F.2d 1306, 1327 (5th Cir.), *cert. denied*, 449 U.S. 1011, 101 S.Ct. 568, 66 L.Ed.2d 469 (1980); *Grunin v. International House of Pancakes*, 513 F.2d 114, 123 (8th Cir.), *cert. denied*, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975). Accordingly, the Fourth Circuit has admonished that the district court is not "to give the settlement 'mere boilerplate approval'" that is "'unsupported by evaluation of the facts or analysis of the law.'" *Flinn v. FMC Corporation*, 528 F.2d 1169, 1173 (4th Cir.1975), *cert. denied*, 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976) (*quoting, Protective Committee For Independent Stockholders of TMT Ferry, Inc. v. Anderson*, 390 U.S. 414, 434, 88 S.Ct. 1157, 1168, 20 L.Ed.2d 1, *reh. denied*, 391 U.S. 909, 88 S.Ct. 1649, 20 L.Ed.2d 425 (1968)). The court "must independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interest of those whose claims will be extinguished." 2 H. Newberg, *Newberg on Class Actions*, § 11.40 at 451 (2nd ed. 1985).

■ Approval will be given only where a proposed settlement is determined to be "fair, reasonable and adequate." *In re Mid–Atlantic Toyota Antitrust Litigation*, 605 F.Supp. 440, 442 (D.Md.1984) (*quoting, Manual on Complex Litigation*, § 1.46 at 56–57 (5th ed. 1982)); *Washington v. Keller*, 479 F.Supp. 569, 572 (D.Md. 1979). In making that determination, this court has followed the bifurcated analysis set forth by Judge C. Stanley Blair in *In re Montgomery County Real Estate Antitrust Litigation*, 83 F.R.D. 305, 315–317 (D.Md.1979). *See also, In re Mid–Atlantic Toyota Antitrust Litigation, supra*, 605 F.Supp. at 442–43. "That analysis includes separate inquiries on the 'fairness' and the 'adequacy' of the proposed settlement." *Id.* at 443. Regarding fairness, Judge Blair stated:

> The factors tending to reveal the 'fairness' of a settlement are those which indicate the presence or absence of collusion among the parties. Because of the danger of counsel's compromising a suit for an inadequate amount for the sake of insuring a fee, the court is obliged to ascertain that the settlement was reached as a result of good-faith bargaining at arm's length. The good faith of the parties is reflected in such factors as the posture of the case at the time settlement is proposed, the extent of discovery that has been conducted, the circumstances surrounding the negotiations and the experience of counsel. (citations omitted).

*In re Montgomery County Real Estate Antitrust Litigation, supra*, 83 F.R.D. at 315. When inquiring into adequacy, "the court must weigh the likelihood of the plaintiffs' recovery on the merits against the amount offered in settlement." *Id.* at 315–316. Specifically, Judge Blair noted that:

> [C]ourts should weigh the amount tendered to the plaintiffs against such factors as (1) the relative strength of the plaintiffs' case on the merits; (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial; (3) the anticipated duration and expense of

additional litigation; (4) the solvency of the defendants and the likelihood of recovering on a litigated judgment; and (5) the degree of opposition to the settlement. (citations omitted).

*Id.* at 316. In *Flinn v. FMC Corporation, supra,* the Fourth Circuit further noted that "[t]he fact that all discovery has been completed and the cause is ready for trial is important, since it ordinarily assures sufficient development of the facts to permit a reasonable judgment on the possible merits of the case." (footnote omitted). 528 F.2d at 1173.

## IV.

■ This case represents perhaps the most hotly and thoroughly contested litigation the undersigned has experienced in twenty years as a judge. Exhaustive discovery efforts were undertaken by both sides. As described earlier, the court has entered over seventy orders in this case and there are over two hundred entries on the docket.

The court concludes that the settlement reached in this action was the result of good faith bargaining at arms' length. Serious settlement negotiations commenced only after plaintiffs had completed a substantial random sampling of defendants' case files as the major item of their discovery; after the court had granted a preliminary injunction following an evidentiary hearing that lasted twelve days; and after the Fourth Circuit had affirmed the injunction. *See, L.J. by and through Darr v. Massinga, supra,* 838 F.2d at 122. Discovery as to plaintiffs' equitable claims is now complete.

Settlement negotiations took place over a period of six weeks and included several half-day and full-day sessions. During these negotiations and throughout this litigation, plaintiffs have been represented by a dedicated, highly skilled, and very experienced team of attorneys. Two members of this team, including William L. Grimm, Esquire, who served as lead counsel, came from the Baltimore office of the Legal Aid Bureau, which represents the great majority of Baltimore's foster children in the ju-

venile courts. Carol R. Golubock, Esquire, of the Children's Defense Fund, has extensive experience in class litigation concerning child welfare law in federal courts. In addition, Nevett Steele, Jr., Esquire, and Ward B. Coe, III, Esquire, partners in the firm of Whiteford, Taylor and Preston, participated in representing the plaintiffs. Both have excellent qualifications and extensive experience in federal litigation, including class action litigation, before this court.

Finally, the question of attorneys' fees was addressed separately from the negotiations concerning the terms of the decree. The discussion of fees was undertaken by a different group of lawyers and concluded well after the submission of the proposed consent decree. Under these circumstances, the court concludes that the settlement was reached in an appropriate manner and is the product of arms'-length bargaining.

## V.

■ Had this action gone to trial, it is very likely that the plaintiffs would have succeeded. For the reasons stated in its Memorandum and Order of July 27, 1987, this court already has determined that success by the plaintiffs would be the likely outcome of a trial on the merits. No viable defenses to plaintiffs' claims for equitable relief are apparent. In deciding whether the proposed consent decree is adequate, the court must weigh this likelihood of plaintiffs' success on the merits against the quality of the relief afforded by the decree. *In re Montgomery County Real Estate Antitrust Litigation, supra,* 83 F.R.D. at 316. Any settlement of this action must afford the plaintiffs relief that is at least comparable to what they could have received following trial on the merits.

The court's ability to make an independent assessment of the adequacy of the settlement in this case rests on substantial knowledge of the problems facing Baltimore's foster care system. This knowledge was acquired through study of the pleadings, meetings with the parties, conducting the settlement hearing, meeting with case workers, and, primarily, through

the twelve-day-long preliminary injunction hearing at which hundreds of pages of documents were entered into evidence.

Evidence presented during the preliminary injunction hearing revealed that many current foster homes are inadequate, and that there is a severe shortage of foster parents. As a result of the shortage of foster homes, defendants have been willing to grant exceptions allowing homes that should have been closed to remain open; have allowed some people to become or remain foster parents who should not have been; and have appeared reluctant to remove children from homes even when there should have been concern for their safety. Accordingly, had judgment on the merits been rendered and the court been charged with fashioning appropriate relief, it would have insisted that a diligent effort be made to recruit new homes. Specific numbers of new foster homes might have been ordered opened by specific dates.

Paragraph 11 of the proposed consent decree addresses recruitment of new foster homes. It does not state specifically what efforts will be made nor estimate how many homes will be opened. Paragraph 11 provides:

> Defendants shall maintain a foster home recruitment unit in Baltimore City Department of Social Services. The unit shall develop and implement a sustained recruitment plan, and shall issue periodic reports on the status of its recruitment efforts.

The court's concern regarding paragraph 11 were heightened by published news accounts of the decree in which defendant Ruth Massinga, Secretary of the Department of Human Resources, was quoted as suggesting that, under the terms of the decree, children could be left in the homes of their natural parents if space in the foster care system was not available.

Naturally, the criteria for deciding when a child is to be removed from the home should focus on the well-being of the child. If the safety of the child requires that a child be removed from the natural parents, space must be available in foster care. Any settlement that provides otherwise is simply inadequate to protect these children and unworthy of the court's approval.

Read in its entirety the proposed decree does appear to provide that foster care placements will be made available for all children who need them. Indeed, paragraph 9 provides in part, that "defendants shall establish and maintain a continuum of foster care placements reasonably calculated to ensure that there are appropriate foster care placements for all children who come into foster care."

During two conferences and in a lengthy letter, the court sought clarification and interpretation of the decree from the parties as to these issues. Defendants responded in their memorandum in support of the decree submitted on July 11, 1988 and at the settlement hearing held on July 18, 1988. In their memorandum and at the hearing, defendants stressed that the decree represents a balance between efforts toward family preservation (aimed at keeping children with their natural parents where possible) and efforts to provide additional foster care placements. Specifically, defendants' memorandum declares that:

> ... [F]ederal law mandates equivalent efforts in family preservation and foster care initiatives and defendants believe that these programs complement each other.

Thus, the decree contains provisions with respect to each of these complementary programs. Foster home recruitment and services will be enhanced significantly under the decree. Specifically, recruitment efforts have been and continue to be extensive. Similarly, significant funding has been obtained to provide intensive family services to prevent children from coming into foster care. Reunification services are also recognized under the decree.

In sum, the Consent Decree adequately addresses the need to provide for foster care placements along a continuum of appropriate placements, including the recruitment of regular foster homes, and simultaneously addresses the need to keep, where appropriate, children from entering the foster care system....

Defendants' Memorandum in Support of defendants' Motion for Approval of the Consent Decree, pages 9 and 10 (citations omitted). *See also* transcripts of settlement hearing held July 18, 1988, page 88. Defendants' memorandum relies on the accompanying affidavits of Philip C. Holmes, Director of the Office of Child Welfare Services of the Social Services Administration of the Maryland Department of Human Resources, and Regina M. Bernard, Director of the Office of Family and Child Development of the Social Services Administration of the Maryland Department of Human Resources. Mr. Holmes avers that the Department of Human Resources "will continue to intensify efforts to recruit foster parents," and that the Department of Human Resources and the Baltimore City Department of Social Services "both have aggressive campaigns to solicit applications from new families." Efforts to recruit new foster homes include increases in the board rates paid to foster parents and an aggressive public relations campaign.[7]

With these clarifications in mind, it is the opinion of the court that, if properly implemented, the consent decree will result in substantial and needed improvements in Baltimore's foster care system, and is adequate to protect the interests of these plaintiffs.[8] Indeed, the decree appears to represent an innovative approach aimed at keeping children with their parents, where possible, coupled with efforts to provide additional and varied placement where placement in foster care is required. Under the "Intensive Family Services" program provided for by the decree a social worker is made available during a period of ninety days for as many hours as necessary to alleviate a family crisis threatening removal of a child from the parents' home. *See* Affidavit of Regina M. Bernard; *Consent Decree*, par. 15. During this period, a variety of services are made available to the parents that will help them to better care for the child. *Consent Decree*, par. 15. A similar program is also to be initiated to facilitate quick reunification in some cases where the child is removed

7. Specifically, in this regard, Mr. Holmes states in his affidavit that:

I am aware of the Court's special concerns about foster home recruitment. It must be remembered that family foster care is not the only, and often not even most appropriate, out-of-home placement for children, particularly those increasing numbers with severe emotional and behavioral problems. DHR has and will continue to intensify efforts to recruit foster parents. Providing child care for working foster parents is an effective recruitment tool. DHR and BCDSS both have aggressive campaigns to solicit applications from new families. DHR has contracted with Vanita Enterprises, Inc., a media consulting firm, to devise and implement a recruitment campaign, which began April 15, 1988, and includes: regular and frequent public service announcements on 12 television and 32 radio stations with Tim and Daphne Reid, Brooks Robinson, John Minor, Rev. Sidney Daniels and Alex Williams; two foster/adoptive care olympic events scheduled in August, 1988; direct mail to Maryland teachers and ministers; and corporate sponsorship of paid network spots. Preliminary results include 195 inquiries from parents interested in becoming foster or adoptive parents.

BCDSS' own efforts have resulted in 43 new foster homes from January 1 through May 31, 1988 out of a total of 168 applications. Recruitment activities have included: paid ads

on WBGR–AM, public service announcements on the major television stations, recruitment booths at city fairs, hospitals, the Social Security Administration and the General Motor plant, subway posters, articles in selected employee newsletters and a speakers's bureau to community groups and churches.

8. The defendants' memorandum furnished in support of the decree, the affidavits of Mr. Holmes and Ms. Bernard, and the presentation of defendants' counsel made during the settlement hearing of July 18, 1988, provide valuable details as to what measures defendants will undertake in order to meet the requirements set forth in the decree. The court has not asked that the decree be amended to recite specific efforts that will be made by defendants to meet the requirements of the decree. It was the intent of the parties to allow the defendants flexibility in implementation of the decree's provisions.

Nevertheless, in evaluating the decree, the court relies on the parties' representations as to specific measures that will be undertaken and may later utilize those representations as a standard through which good faith in carrying out the terms of the decree will be measured. Accordingly, the court fully expects the defendants to undertake those specific measures revealed to the court or to undertake measures comparable to them. The court is confident that defendants will make every effort to do so.

from the home. *Id.* par. 17. Among the variety of placements that will be provided, in addition to the recruitment of new regular foster homes, are emergency shelter care placements and specialized foster care placements for children with specialized needs. *Id.* par. 9.

In its order of July 27, 1987 granting preliminary injunctive relief, the court included various remedial measures intended to provide increased protection to foster children until a full hearing on the merits could be held. The court's confidence in the settlement is strengthened by the inclusion of several of these measures as part of the decree. These include requirements that each foster home be visited once a month; that, if an abuse or neglect complaint is received regarding a home, visits be made once a week, *id.*, par. 22–24; copies of the abuse or neglect report be provided to the child's attorney, *id.*, par. 30; and that some major improvements be made in the system for providing health care to foster children. *Id.*, par. 21A–F.

Most important in assessing the adequacy of the settlement proposed in this action is the great degree to which the decree provides plaintiffs with substantially all the equitable relief they requested from the court in their complaint. The relief provided under the terms of the decree is comprehensive in scope and includes provisions that strengthen requirements for education of foster children, *id.*, par. 19; require certain information about foster children to be provided to their foster parents, *id.*, par. 14; increases foster care stipends, *id.*, par. 10; and provides for training of foster parents and foster care workers, *id.*, par. 6, 7, and 13. Importantly, the decree requires substantial decreases in the work load of foster care workers by providing low maximum case loads for workers, *id.*, par. 5.

The preliminary injunction hearing revealed serious deficiencies in the system for providing health care to foster children. Specifically, the court found that incomplete medical histories were provided to medical care professionals and that treat-

ment rendered to foster children was episodic rather than continuous. Accordingly, as preliminary injunctive relief, the court required defendants to assign sufficient staff and resources to ensure that proper medical histories are obtained and that appropriate medical care is provided foster children. The decree amplifies and expands on the court's preliminary injunctive relief, *id.*, par. 21. It requires that an initial health care screening take place within twenty-four hours of the child's placement in foster care; that a comprehensive health assessment be completed within sixty days of placement; and that complete medical histories containing specific information be obtained and provided to physicians. Defendants are responsible for ensuring that treatment for any diagnosed problems is promptly provided.

Foster children placed in the homes of relatives are not expressly mentioned in the plaintiffs' prayers for relief. At the time plaintiffs' amended complaint was filed with the court, plaintiffs' counsel were unaware that this group of foster children was treated far differently from other foster children. Indeed, at the time of the preliminary injunction hearing, it appeared that foster children placed with relatives were not considered nor included as part of the foster care system. Children placed with relatives were not counted in the foster care system inventory and their caretakers did not receive foster care benefits.

According to defendants, approximately 1,100 children are placed with their relatives.[9] At this time, most of the provisions of the decree will not be applied to them; instead a study by an impartial consultant will be undertaken in which the status of each child placed with a relative will be assessed. *Id.*, Par. 27A. The plaintiffs may request additional relief for these children when the impartial assessment is completed. *Id.*, par. 28. The decree, however, does provide for the immediate implementation of certain basic protections for children placed with relatives, including the development of case plans; six and eigh-

---

**9.** In a letter to the court dated July 14, 1988, the Foster Care Review Board estimated that as many as 2,000 children are placed with relatives.

teen-month reviews by persons outside the BCDSS, and bimonthly home visits to ensure compliance with health and safety standards. *Id.*, Par. 25–28. In addition, relatives providing care to foster children will be encouraged to apply for licensure as foster parents. *Id.*, Par. 25D. Care being provided to these children also will be evaluated by means of contacts with their teachers and medical case providers. *Id.*, Par. 27B.

Although the court required a thorough notice to the class, there were no outright objections lodged against the decree. Both the Foster Care Review Board and foster care workers, however, did express some reservations. In a letter to the court dated July 14, 1988, the chairperson of the State Foster Care Review Board[10] expressed particular concern about the lack of foster homes. Joan L. Graham wrote that the lack of homes "keeps the placement of children at a crisis level, results in inappropriate, short term placements and multiple placements for some children." As noted earlier, the court shares the Board's concern that more be done to recruit adequate foster homes. In deciding that the decree adequately protects this class of children, the court relies on defendants' assurances and interpretation of the decree as requiring vigorous efforts to recruit new homes.[11]

At the settlement hearing addressing the adequacy of the consent decree and later during a conference with the court, foster care workers expressed strong reservations about whether the terms of the decree could be implemented from a practical standpoint. They emphasized that they will be charged with the responsibility of implementing the decree on a day-to-day basis, and, without the benefit of additional resources, they doubted they could carry out the decree's terms. Specifically, the foster care workers noted that they are often required to travel hundreds of miles in a month in order to meet their obligations. They also must take on additional obligations when a co-worker is sick or on vacation. It is the apparent consensus among foster care workers that they will be unable to make the additional visits to foster homes and foster children required by the decree without additional resources. Accordingly, the workers asked the court to amend the decree to require their superiors to provide transportation aides and a pool of temporary substitute workers. The transportation aides could assist workers in meeting requirements to visit foster homes and also assist in transporting children and foster parents to medical and other appointments. A pool of temporary or substitute case workers could take over cases assigned to workers who are unable to be at work without the necessity of over-burdening other regular workers.

Noting that the suggestions of the foster care workers had substantial practical merits, the court wrote the parties and asked if transportation aides and a pool of temporary workers might be agreed upon as a means of properly implementing the decree. In response, both parties informed the court that these measures had been a subject of the negotiations that produced the decree. It was determined in those negotiations, however, that the specific measures adopted in order to achieve the requirements of the decree were to be left to the judgment of the defendants, at least at this early stage.

Furthermore, during the meeting with foster care workers, counsel for the plaintiffs emphasized that, if the requirements

---

**10.** There are 24 citizen Foster Care Review Boards in Baltimore City with seven members each. The Boards provide independent citizen input as to whether BCDSS plans for each child in foster care is appropriate.

**11.** The Board also expressed concern about proper training of foster care workers; that provisions be made for children placed with relatives; and that visits to foster homes be meaningful. The court believes the decree's provisions for training of foster care workers are adequate. The provisions implemented immediately for children placed with relatives are also adequate pending the earlier described independent assessment of the status of those children. Lastly, if the visits to homes cannot be carried out with the maximum ratios of children-to-workers provided by the decree, the defendants will be required to reduce the workers' case loads below the maximum ratios.

of the decree could not be met by case workers, the defendants would be required to reduce the case load ratios of children to foster care workers below the maximum ratios allowed by the decree. In this way, the work load would be lessened to allow the foster care workers to better meet their obligations under the decree.

The foster care workers also asked that they be allowed to participate in the implementation and monitoring of the decree. Specifically, they requested to receive the reports required every six months from the BCDSS and the Department of Human Resources that set forth the steps taken to achieve compliance with the decree, and requested that they be given an opportunity to be heard. During its August 3rd meeting with foster care workers, the court was impressed by their commitment to foster children and their strong desire that the foster care system be improved. Moreover, since these workers will implement the decree on a day-to-day basis, their views may be worth hearing in the future. Accordingly, as part of its enforcement powers, the court will order that defendants deliver the six month reports to the foster care workers. Should they wish to be heard after receiving a report, the court would seriously consider such a request at that time.

## VI

For the reasons stated above, the court finds that the consent decree submitted by the parties on April 26, 1988 is fair, reasonable, adequate and deserving of approval.

The court closes with a personal note and word of caution. I have now been a judge for twenty years. During this time much human tragedy has passed before me; however, none has so deeply touched me as the plight of these children. I believe that vigorous enforcement of this decree is essential, and I will do all within my power to see that its provisions are fully implemented.

## ADDENDUM A: CONSENT DECREE

### CONSENT DECREE

This Decree is made and entered into by and between all of the named plaintiffs, L.J., O.S., M.S., C.S., P.G., R.K., and S.J., and the certified class of persons whom plaintiffs represent as set forth in the January 16, 1987 Order of this Court (hereafter described in Attachment A and collectively referred to as "plaintiffs") and all defendants.

WHEREAS, on or about December 5, 1984, plaintiffs commenced an action in the United States District Court for the District of Maryland (hereinafter "the Court" or "this Court") and thereafter filed a first amended complaint, and plaintiffs R.K. and S.J. filed a motion to intervene, which was granted herein on or about January 21, 1987;

WHEREAS, plaintiffs' complaint, amended complaint, and complaint in intervention make certain allegations and seek certain relief with respect to the foster family care program administered by the State of Maryland, particularly as that program is administered by the Baltimore City Department of Social Services;

WHEREAS, defendants deny all of the allegations of the complaint, amended complaint, and complaint in intervention, particularly all legal contentions that any defendant has ever violated any State or federal law in the conduct of the family foster care program;

WHEREAS, plaintiffs allege that children who are committed by the juvenile court to the defendants' care and custody and who are placed with their relatives are entitled to the same protections as children placed with non-relatives, and defendants dispute that the same protections apply to these children;

WHEREAS, defendants have taken and continue to take substantial positive actions to improve the quality of care and services provided to foster care children; and

WHEREAS, in an effort to avoid further litigation, plaintiffs and defendants believe that settlement of this matter and entry of this Consent Decree is in the public interest, without any admission of liability by any defendant for any purpose, to settle

and resolve all claims for declaratory relief and equitable relief, including injunctive relief, raised in the complaint, amended complaint, and complaint in intervention, and all matters addressed in this Decree.

NOW, THEREFORE, it is hereby ORDERED, ADJUDGED, and DECREED as follows:

## JURISDICTION

1. This Court has jurisdiction of the subject matter of this Consent Decree. In the event of subsequent litigation relating to the matters in this litigation other than in an action to enforce this Decree, defendants retain and have the right to contest jurisdiction, venue, and/or assert any other defenses.

## PARTIES

2. The provisions of this Consent Decree shall apply to and be binding upon the parties to this civil action, and upon their employees, heirs, successors-in-interest, and assigns.

3. The undersigned representatives of the plaintiffs and defendants certify that they are fully authorized subject to the Federal Rules of Civil Procedure to enter into and to execute the terms and conditions of this Consent Decree and to legally bind the parties, including all members of the certified plaintiff class.

4. The parties agree that the defendants' obligation to give notice of this Consent Decree to the plaintiff class is restricted to giving notice to their undersigned counsel by their signing and receipt of this Decree, receipt of which is hereby acknowledged. In addition, defendants will send out notice of this Consent Decree to all foster parents, to all relatives with whom DSS has placed children, to all parents known to defendants as having children in foster care or placed with relatives and to the organizations listed in Attachment B.

## ASSIGNMENT OF CASEWORKERS AND CASES

5. Within two years of the date of the entry of this Decree:

(a) continuing care caseworkers in the Baltimore City Department of Social Services (hereinafter "DSS") who are responsible for children in foster care, other than those aftercare workers responsible for children for whom a recission order has been requested, shall have average caseloads of no more than 20 children and their biological families;

(b) intake caseworkers in DSS who are responsible for a caseload of children in foster care shall have average caseloads of no more than 14 children and their biological families;

(c) DSS caseworkers who are responsible for the supervision of foster family homes shall have an average caseload of no more than 40 foster families;

(d) immediate supervisors of DSS foster family care workers shall have an average of no more than six caseworkers under their supervision; and

(e) the standard with respect to the transfer of cases when a worker leaves DSS or transfers to another unit shall be as follows: When a worker leaves or transfers to another unit, the supervisor shall reassign cases, except for priority cases, to other workers within five working days. The supervisor may, based on the needs of the unit, retain a priority case or reassign it. Priority cases will include those in which a child requires a new placement; a child has medical needs or imminent appointments; a child has impending juvenile court or administrative review; or a child is the subject of a report of maltreatment. There shall be a conference between the supervisor and the new worker within 10 working days of reassignment. If possible, the former worker shall attend the conference. The topics to be discussed at this conference shall include, among other things, a discussion of any immediate unmet needs of the child, therapy and evaluations in progress, and existing service agreements.

## CREDENTIALS AND TRAINING OF CASEWORKERS

6. Defendants shall continue their current policy that no DSS caseworker without

**520**

at least a B.S. or a B.A. degree shall have responsibility for supervising the continuing care of children in foster family homes.

7. A. Within two years of the date of entry of this Decree, all caseworkers shall receive at least four days of orientation and training relating to the substantive aspects of the caseworker's responsibilities within 60 days of beginning employment as a DSS caseworker. Such training will take into account the level of prior child welfare experience and the need for additional training for those with limited or no prior training. Such training will include casework skills; interviewing; developing service agreements and case plans; working with families; and the structure and law governing child welfare.

B. Within two years of the date of entry of this Decree, all caseworkers shall receive annually 20 hours of training relating to the substantive aspects of the caseworker's responsibilities. This training shall begin for each caseworker during his or her second year of employment.

### SPECIALIZED SUPPORT UNIT

8. Within six months of the entry of this Decree, defendants shall establish within DSS a specialized unit to assist caseworkers and supervisors to manage effectively cases that require specialized experience and/or knowledge in areas such as assisting children or parents who need services for drug and alcohol abuse; special educational needs; developmental disabilities; mental health or other specialized health care needs; or the development of independent living skills. This unit shall assist workers in identifying, locating and obtaining resources or services for drug and alcohol abuse; special educational needs; developmental disabilities; mental health or other specialized health care needs; or the development of independent living skills. The responsibilities of this unit do not include direct case responsibility or the providing of direct services.

### FOSTER PLACEMENT RESOURCES

9. Within two years of the entry of this Decree and to the extent within their control, defendants shall establish and maintain a continuum of foster care placements reasonably calculated to ensure that there are appropriate foster care placements for all children who come into care. The continuum shall include regular foster homes, specialized homes, emergency shelter homes, emergency shelters, group homes and therapeutic foster homes as defined in COMAR. (Therapeutic foster homes are homes in which foster parents receive a salary and other services in addition to the foster care board rate.) In addition, defendants shall seek annually sufficient funds through their budget requests or elsewhere (i) to purchase special services for children in foster care needed to prevent their institutionalization, and (ii) to assure stipends to emergency shelter care homes even in months in which no children are being cared for.

10. Defendants shall continue their past practice of seeking through the budget process increases in the rate of reimbursement paid to foster families by including such increases in their budget requests and advocating for their appropriation with the goal of reaching by State Fiscal Year 1991 a rate of no less than the amount determined by the United States Department of Agriculture as necessary to care adequately for children in urban areas of the southern region of the country.

11. Defendants shall maintain a foster home recruitment unit in DSS. The unit shall develop and implement a sustained recruitment plan, and shall issue periodic reports on the status of its recruitment efforts.

12. Within one year of entry of this Decree, defendants shall require as a condition of licensure that all new foster parents complete a course of pre-service training of at least 12 hours. The training shall cover an appropriate curriculum, including applicable DSS regulations; the role of the foster parents and the child's caseworkers; the special needs of foster children; the need to work with natural parents; appropriate disciplining methods and alternatives to corporal punishment; the importance of utilizing medical, dental, educational, and

other community services; and the legal rights of foster parents, children and natural parents.

13. Defendants shall require foster parents to participate in at least six hours of foster parent training a year. One year after entry of this Decree, no foster parent's license may be renewed unless one of the foster parents in the home has received the required training. Defendants shall seek through the budget process and advocate for their appropriation funds to pay foster parents a reasonable sum in consideration of their attendance at required training including reasonable transportation and child care expenses.

### INFORMATION ON FOSTER CHILDREN

14. Before a child is placed in a foster home, DSS shall provide the foster parents necessary information about the child including the reason for the child's coming into care initially and, if applicable, the reason for the current placement; medical, psychological or behavioral problems that the child may have of which the agency has knowledge and any on-going treatment the child is receiving for any such problems of which the agency has knowledge. In addition, DSS shall make reasonable efforts to provide foster parents with the child's recent grade and attendance record in school. If an emergency placement is necessary, defendants shall provide the information to the foster parent within ten working days of placement.

### PERMANENCY AND INTENSIVE FAMILY SERVICES

15. A. Except in emergency situations where a child faces a substantial risk of harm and where services cannot prevent the removal of the child, reasonable efforts will be made by the appropriate DSS personnel prior to placement of a child in foster care to prevent or eliminate the need for removal of the child from his or her home. Such reasonable efforts to prevent or eliminate the need for placement or to reunify a child who has been placed shall include, where appropriate in the worker's professional judgment, the provision or securing of family counseling services, drugs and alcohol abuse services, day care, parenting education services and assistance provided under the federal Emergency Assistance to Families with Children program to the extent allowed by law. Services and assistance shall be provided in a duration and intensity reasonably assured of meeting their goal.

B. Defendants shall seek through the budget process and advocate for their appropriation sufficient funds to provide a program of intensive family services the goal of which shall be to reduce the number of children who need to be removed from their biological homes.

C. A case plan for each child in foster care shall set forth the services and assistance that have been provided to prevent or eliminate the need for removal from the home and the reasons those efforts did not succeed.

16. In all cases in which the goal is to return a foster child to his or her biological home, defendants shall make reasonable efforts to facilitate weekly visits between the parent and child, unless the juvenile court orders otherwise, or DSS finds that such visits are not in the child's best interest. Before permanent reunification, overnight and weekend visits should be provided if appropriate.

17. A. In each case in which the case plan is the child's return home, DSS shall enter into a service agreement with the biological parent of the child within 60 days of the child's placement unless the parent is unavailable or unwilling to agree. The agreement shall set forth the current barriers to the child's return home, the steps the parent must take in order to have the child returned to him or her, the timelines for completion of these steps, the services, if any, the caseworker and DSS will provide to the parent (for example, referral to alcohol abuse counseling) and the timelines within which any services will be provided.

B. Defendants shall continue to follow the guidelines for workers on when a permanency plan shall be changed from return home. Such guidelines require that the

case plan goal be changed promptly when the parent fails continuously to fulfill terms agreed to in the service agreement and/or when the parent has not maintained regular visitation or other contact with the child.

18. A petition for termination of parental rights shall be filed on behalf of each child for whom the goal is adoption within 120 days of the DSS establishing such a goal.

## EDUCATION

19. A. Within five working days of being placed in nonemergent foster care, a child of school age shall be attending school (if school is in session), unless school attendance within five working days is unattainable for reasons outside the control of DSS. In such cases, DSS will make all reasonable efforts to obtain school attendance as soon as practicable.

B. If a child's caseworker has reason to believe that a foster child may be educationally handicapped and is not receiving special educational services, the worker shall promptly notify the local educational agency and request a screening for that child in writing. The child's caseworker shall be responsible for:

(1) providing, when requested, all evaluations of the child contained in DSS files;

(2) attending meetings on behalf of the foster child relating to identification, evaluation and placement of the child in a special educational program, where possible;

(3) providing the address of the biological parents to the local education agency if contained in DSS files; and

(4) facilitating appointments for evaluation of the child relating to the special educational decision-making process.

C. Within two years of the entry of the Decree, all caseworkers shall receive training with respect to the special education screening, evaluation, assessment and individualized education plan process. Thereafter, the worker shall notify the child's attorney if these services are not provided in a timely fashion.

D. If DSS holds guardianship with the right to consent to adoption or long-term care short of adoption of a child and that child is educationally handicapped or is suspected of being educationally handicapped, the child's caseworker shall provide the local education agency with appropriate documentation of the child's legal status so that the school can apply for the appointment of a parent surrogate.

## EXPLANATION OF RIGHTS

20. Within six months of entry of this Decree, defendants shall prepare a handbook describing the rights and responsibilities of foster children, biological parents and foster parents. Defendants shall provide a draft of the handbook to plaintiffs' counsel. Defendants shall consider, but need not adopt, any suggestions plaintiffs' counsel report to defendants within 30 days of receipt of the draft handbook. Thereafter, the defendants shall cause the handbook to be reproduced and distributed to all current foster children, where age appropriate, their biological parents and all current foster parents. The handbook shall be provided to all new foster children, where age appropriate, their biological parents, and all new foster parents.

## HEALTH CARE

21. A. Defendants shall develop and maintain a medical care system reasonably calculated to provide comprehensive health care services to foster care children in a continual and coordinating manner in accordance with their needs.

B. All foster children shall have an initial health care screening if possible before placement in an out-of-home care setting, but in any event, no later than 24 hours following placement.

C. All foster children shall be referred for a comprehensive health assessment within 30 days of entering placement. The assessment shall be completed within 60 days of entering placement. This assessment shall address the child's medical, emotional and developmental needs. The results of this assessment will be made available to the child's health care provider(s).

The provider(s) selected by DSS to provide health care for the child shall be reasonably calculated to meet the child's specific needs identified by the assessment.

D. All foster children shall have periodic medical, dental and developmental examinations in accordance with the schedules or protocols of the EPSDT. If needs are identified at the periodic examinations that were not identified previously, the provider(s) selected by DSS shall be reasonably calculated to meet these additional needs.

E. For each child in foster care the defendants shall develop and use an abbreviated health care record (e.g., medical passport), which shall accompany the child through the out-of-home care system and upon his or her return home, adoption or emancipation. An abbreviated health care record shall require the following information: the medical facilities where the child usually receives care, the child's condition at placement as documented by his or her physician, and the child's immunization record, allergies/adverse reactions, chronic health problems and present medications. The foster parents of the child shall be provided with the health passport completed to the extent possible at the time of a child's replacement or if an initial placement within 5 days of placement. Copies of the forms contained in the passport shall be included in the child's case record and shall be reviewed by a supervisor at least every 6 months.

F. Within two years of entry of this Decree, defendants shall establish and maintain a health services management unit within DSS. This unit shall be staffed by one or more health professionals who are trained and experienced in child health care.

## CASEWORKER VISITS WITH FOSTER CHILDREN

22. Each child in a foster family home shall be visited by their assigned caseworker or his or her substitute at least once every month. The purpose of the visit is to assess the quality of care being provided to the child and the child's adjustment to the foster home, foster parents, other persons present in the home, and school. The interview shall be of sufficient duration and privacy to evaluate the child's adjustment to placement in the foster home. The caseworker shall indicate the date and summarize the results of each visit in the child's case record. Where indicated, the caseworker, based on his or her professional judgment, shall visit or contact the child more frequently. During the first three months a child is placed or replaced, the caseworker shall visit or contact the child more frequently when in his or her professional judgment such is appropriate.

23. If an abuse or neglect complaint is filed pertaining to a foster family home, the assigned caseworker(s) shall visit the home at least once a week until the complaint is ruled out.

24. If an abuse or neglect complaint is not ruled out, the caseworkers shall visit the home at least once a week until the children are removed from the home or until the juvenile court orders otherwise or the child's attorney and DSS agree otherwise.

## PLACEMENT WITH RELATIVES

25. A. A child committed by the juvenile court to DSS may be placed with his or her relative(s).

B. Such a child shall be provided a case plan and 6–month administrative and 18–month juvenile court reviews of his or her placement. DSS shall request that the Foster Care Review Board conduct the 6–month administrative reviews.

C. Within six months of the date of entry of this Decree, each child placed with a relative shall be visited by a caseworker no less frequently than once every two months.

D. A relative with whom a child committed to DSS has been placed may apply for a license as a foster family home. DSS shall inform the relative of the benefits of and requirements for licensure.

26. A. Within one year of the date of the entry of this Decree, DSS shall complete an inventory of each relative placement to determine whether each home

meets basic health and sanitary standards such as the existence of adequate heat, light, water, cooking and refrigeration facilities, toilet facilities and smoke detectors, and the absence of exposed wiring, rodent or insect infestation, broken windows, doors or steps, and holes in walls or ceilings. If the DSS employee or agent conducting the inventory observes evidence of any threat to the child's health or safety, the DSS employee or agent, if other than the child's worker, shall report that evidence to the child's worker. The results of the inventory shall be made available to plaintiffs' attorneys upon the issuance of a protective order.

B. In addition, defendants will seek the necessary statutory authority to conduct criminal background investigations for relative caretakers and others known to be in the household. After such approval is obtained, DSS shall conduct such investigations for existing and prospective caretakers and others known to be in the household.

C. Within six months of the entry of this Decree, DSS shall determine if a home meets basic health and sanitary standards within 30 days of placement.

27. A. Within one year of the entry of this Decree, an assessment shall be made of the health and educational status of each child placed with a relative. The assessment shall be completed by an impartial consultant selected through the State procurement process. The selection of the consultant shall be made by an evaluation committee or review panel. One member of the committee or panel shall be mutually acceptable to the parties.

B. The consultant shall oversee the gathering of data for the assessment. The assessment shall include contacts with the child's education provider and medical provider. The consultant shall determine generally the child's educational and medical status and the existence, if any, of unmet needs of the child. The child's caseworker shall make reasonable efforts to facilitate the child's obtaining educational and medical services sufficient to address the identified unmet needs. A report of the assessment result in regard to each child shall be made available on a quarterly basis to plaintiffs' attorneys upon the issuance of a protective order.

28. Within 30 days of receipt of the final consultant's report, plaintiffs may file objections pursuant to ¶ 35 of this Decree, including a statement of why children placed with relatives are entitled to additional protections.

## REPORTS OF ABUSE AND NEGLECT

29. Whenever a DSS employee has reason to suspect that the abuse or neglect of a child in foster care or a child placed with a relative has occurred, the DSS employee shall notify the protective service unit of DSS. Children who are the subject of an abuse report shall be visited within 24 hours of the receipt of a complaint by either a protective services worker or staff of the police department. Children who are the subject of a neglect report shall be visited within five days.

30. Whenever there is a report of abuse or neglect of a child in a foster family home or a child placed with a relative, DSS shall notify the attorney for the child in a foster family home and, within six months of the entry of this Decree, the attorney for the child placed with a relative, if it knows of any, the child's biological parents unless psychologically contraindicated or their whereabouts or identity is unknown, and such other persons as are required to be notified by State law. Notification to the child's attorney and/or biological parents shall be within five working days of receipt of a report. A copy of the report shall be provided to the child's attorney. The completed disposition of the complaint shall be submitted to the child's attorney within five working days of its completion.

## SCOPE AND APPLICATION OF DECREE

31. This Decree shall apply only to those children certified as members of the plaintiff class. This Decree creates no rights in favor of any other person and creates no obligations or duties on the part of defendants with respect to any pro-

grams other than the DSS foster family care program and the DSS services to extended families with children program. A violation of this Consent Decree shall not create a new, independent private cause of action for damages for anyone. Nothing set forth in this paragraph shall bar the Court's contempt power for violation of the Decree.

## REPORTING, MONITORING AND ENFORCEMENT

32. If the Court ever finds that any defendant, or any successor of any defendant, has failed to satisfy his, her or its obligation under this Decree, the Court shall not order any extraordinary relief (including the imposition of a fine or imprisonment) against or respecting that defendant or against any defendant (either to punish a defendant for alleged non-compliance or to stimulate future compliance) unless the Court first finds by a preponderance of the evidence that the defendant(s) failed to meet his, her, their or its obligations due to some fault or lack of good faith on the part of the defendant(s).

33. Beginning six months following the entry of this Decree and at six-month intervals thereafter, defendants shall file with the Court a report setting forth the steps they have taken to achieve compliance with this Decree. A copy of the report shall be served on plaintiffs' attorneys of record.

The report shall include the following data from a six month period ending no earlier than two months before the date of the report:

a. the number of DSS foster care, continuing care and intake caseworkers; the number of immediate supervisors of such caseworkers; and the number of average cases for continuing care workers and for intake workers;

b. the number of DSS foster home caseworkers, the number of immediate supervisors of such caseworkers; and the number of average cases;

c. the number of restricted and general foster homes approved;

d. the number of children's and home caseworkers who have been hired;

e. schedule of the rates of reimbursement available to foster parents;

f. the number of emergency foster homes and the number of children who can be served by each home;

g. effective July 1, 1988, the number of current foster parents who have completed the requisite pre-service and/or continuing training;

h. the number of foster children receiving aftercare services who are placed with a relative, the number of foster children who are placed with a relative in a restricted foster home, and the number of children who are committed by the juvenile court to DSS and who are placed in a relative home, which home is not a licensed foster care home;

i. the number of complaints of abuse and/or neglect of children in foster homes received and the disposition of such complaints;

j. commencing with the second semiannual report, the number of complaints of abuse and/or neglect of children placed with relatives received and the disposition of such complaints;

k. the number of children entering foster care and the date of his or her first medical assessment in regard to each such child;

l. the number of children for whom a goal of return home has been established; the number for whom a plan of adoption has been established; the number for whom a petition to terminate parental rights has been filed; and the number for whom such petitions have been granted;

m. a report on expenditures for support services and reunification funds as of the most recent end of fiscal year or mid-fiscal year;

n. the number of foster homes reassessed;

o. a summary of the quality assurance forms used by DSS as described in a letter dated April 5, 1988 from Mark J. Davis to

William L. Grimm attached hereto as Attachment C; and

p. the number of workers who have attended training and the nature of the training provided.

34. A. Any time after the expiration of two years following the entry of this Decree, defendants may file a final report showing implementation of and compliance with this Decree.

B. Until the defendants file their final report, defendants shall file a semiannual report in the format set forth in paragraph 33. Defendants' obligation to report to the Court shall conclude once the final report has been filed with the Court.

35. Plaintiffs may file any objections to defendants' reports within 30 days of the filing of the report, after which the Court may decide to hold a hearing on the matter, assuming strict compliance with the terms of ¶ 36, *infra*.

### RESOLUTION OF DISPUTES

36. A. Before any party may bring any matter before the Court with respect to any problem arising under this Decree, including any alleged non-compliance, the parties must confer and attempt to resolve the problem. If plaintiffs' attorneys present a dispute arising under this Decree involving an individual class member, plaintiffs' attorneys may inspect the file of that child, the child's parents, and the child's foster parent(s) upon obtaining a protective order. The parties agree to cooperate in obtaining the necessary protective order. Nothing set forth in this paragraph shall limit the rights of discovery of an attorney appointed for a child by the juvenile court in that proceeding.

B. The Court shall not entertain any alleged dispute in which the movant does not certify that good faith efforts have been made to attempt to resolve the dispute. This certificate shall include the date, place, time and participants in any conference to resolve the matter.

### CLAIMS OF INDIVIDUAL PLAINTIFFS

37. The claims of plaintiff R.R. are hereby dismissed with full prejudice.

38. With respect to the individual damage claims of the other individual plaintiffs, with the exception of plaintiffs-intervenors R.K. and S.J. for whom no individual damage claims have been made, this Decree does not resolve these individual damage claims.

### ATTORNEYS' FEES AND COSTS

39. The parties agree to continue to negotiate in good faith the settlement of plaintiffs' claims for attorneys' fees and costs until July 30, 1988. If settlement is not reached by that date, the plaintiffs may file a petition for an award of attorneys' fees and costs with the Court for its consideration or for referral to a magistrate. Plaintiffs agree not to file any such petition during the negotiations up to and including July 30, 1988.

### CONTINUING JURISDICTION

40. The parties agree that the Court shall retain jurisdiction over this case until the terms of this Consent Decree are fully implemented for the purposes of (i) assuring implementation and (ii) allowing any party to apply at any time for an order seeking interpretation, implementation, enforcement, or modification of this Decree.

THE PLAINTIFFS, BY THEIR COUNSEL, AND THE DEFENDANTS BY SECRETARY MASSINGA AND THEIR COUNSEL ENTER INTO THIS CONSENT DECREE AND SUBMIT IT TO THE COURT THAT IT MAY BE APPROVED AND ENTERED AS AN ORDER OF COURT.

For the Plaintiffs:

(s) William L. Grimm
Legal Aid Bureau, Inc.
Candler Building
714 East Pratt Street
Baltimore, Maryland 21202
(301) 539–5340

(s) Carol R. Golubock
Children's Defense Fund
122 C Street, N.W.
Washington, D.C. 20001
(202) 628–8787

(s) Nevett Steele, Jr.
Whiteford, Taylor & Preston
7 St. Paul Street, Suite 1400
Baltimore, Maryland 21202
(301) 347–8700

For the Defendants:

(s) Ruth Massinga
Secretary, Department of
Human Resources
J. Joseph Curran, Jr.
Attorney General of Maryland

(s) Catherine M. Shultz
Assistant Attorney General
The Munsey Building, 2nd floor
7 North Calvert Street
Baltimore, Maryland 21202
(301) 576–6317

(s) Mark J. Davis
Assistant Attorney General
311 West Saratoga Street
Baltimore, Maryland 21201
(301) 333–0019
Counsel for defendants.

APPROVED AND ENTERED on this 27th day of September, 1988.

(s) Joseph C. Howard
United States District Judge

---

### ATTACHMENT A

*L.J. v. Massinga Class Members*

All children who are, have been and may possible again, or will be placed in foster homes by the Baltimore City Department of Social Services and are or will be placed in the custody of the Baltimore City Department of Social Services pursuant to:

(a) an authorization or order of emergency shelter care granted to the Baltimore City Department of Social Services by an intake officer or by the Circuit Court for Baltimore City, Division of Juvenile Causes, under the provisions of Md.Cts. & Jud.Proc.Code Ann. § 3–815, or

(b) in order of commitment, care, or custody granted to the Baltimore City Department of Social Services by the Circuit Court for Baltimore City, Division for Juvenile Causes, under Md.Cts. & Jud.Proc.Code Ann. § 3–820, or

(c) an order of guardianship with the right to consent to adoption or long-term care short of adoption granted to the Baltimore City Department of Social Services by the Circuit Court for Baltimore City under Md.Fam.Law Code Ann. § 5–301 *et seq.*, or former Md.Ann.Code Art. 16, §§ 67 *et seq.*, or

(d) a voluntary foster care agreement between their natural parents or legal guardians and the Baltimore City Department of Social Services.

### ATTACHMENT B

*L.J. v. Massinga Consent Decree List of Organizations to Receive Notice*

Clinton Bamberger, Esq.
University of Maryland School of Law
Clinical Law Office
510 West Baltimore Street
Baltimore, Maryland 21202–1786
Stephen Ney, Esq.
Maryland Disability Law Center
2510 St. Paul Street
Baltimore, Maryland 21218
Sheila K. Sachs, President
Bar Association of Baltimore City
111 North Calvert Street
Room 627, Courthouse East

Baltimore, Maryland 21202
James Wiggins, President
Monumental City Bar Association
Clarence M. Mitchell Jr. Courthouse
Room 401
Baltimore, Maryland 21202
Pamela Anne Bresnahan, President
Women's Bar Association of Maryland
28th Floor
401 East Pratt Street
Baltimore, Maryland 21202
Anne Pecora, Esq.
University of Baltimore School of Law
Clinical Law Office
Suite 101
1420 North Charles Street
Baltimore, Maryland 21201
John Michener
Maryland Volunteer Lawyer Service
520 West Fayette Street
Suite 130
Baltimore, Maryland 21201

ATTACHMENT C

THE ATTORNEY GENERAL

Saratoga State Center

Suite 1015

311 W. Saratoga Street

Baltimore, Maryland 21201

(301) 333–0019

April 5, 1988

William L. Grimm, Esq.
Legal Aid Bureau, Inc.
7th Floor
714 E. Pratt Street
Baltimore, Maryland 21202–3105

Re: *L.J. v. Massinga*

Quality Assurance Report Summaries

Dear Bill:

This letter supersedes my letter to you of March 29, 1988 on the contents of Quality Assurance Report Summaries to be provided to plaintiffs in accordance with paragraph 32(*o*) of the Consent Decree.

DSS continues to use forms D–885 and D–887 to review a child's case record and a foster home record, respectively. Monthly summaries of the information gathered from the files will be provided to plaintiffs from these forms or forms reasonably in accordance with them.

DSS has yet to modify the form to reflect the Health Care provisions of the Consent Decree. However, it expects to do so and will track compliance with the following requirements:

1. That foster children have an initial screening no later than 24 hours following a placement;

2. That foster children be referred for a comprehensive health assessment within 30 days of entering placement and that the assessment be completed within 60 days;

3. That foster parents be provided with a child's health passport within five days of initial placement or at the time of a child's placement;

4. That copies of forms contained in the passport be included in the child's case records and be reviewed by a supervisor every six months; and

5. That foster children have periodic medical, dental and developmental examinations in accordance with the schedules or protocols of the EPSDT.

Very truly yours,
/s/ Mark Davis
Mark J. Davis
Assistant Attorney General

MJDO89:jas
cc: Carol R. Golubock, Esq.
Jeanne D. Hitchcock, Esq.
Catherine M. Shultz, Esq.
Nevett Steele, Jr., Esq.
Ethel Zelenske, Esq.

ADDENDUM B: MEMORANDUM AND ORDER GRANTING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION DATED JULY 27, 1987

MEMORANDUM AND ORDER

This is a class action by foster care children who allege that defendants' adminis-

tration of the foster care system in the City of Baltimore violates plaintiffs' rights under federal statutory law, Titles IV–E and IV–B of the Social Security Act, and the Fourteenth Amendment of the United States Constitution. The class representatives also seek monetary damages for the harms allegedly suffered while in the care and custody of the defendants.

Pending before the Court are plaintiffs' motions for (1) a preliminary injunction (2) sanctions based upon defendants' failure to respond factually to plaintiffs' motion for preliminary injunction and (3) a default judgment. A hearing on the motions was held from April 2 to April 15, 1987, the parties submitted post-hearing briefs by May 22, 1987. Some 91 separate items of evidence were introduced and the Court heard from 12 witnesses. Among the items of evidence were seven looseleaf binders including scores of documents. For the reasons which follow, the motions will be granted.

I.

MOTION FOR PRELIMINARY INJUNCTION

In their motion for a preliminary injunction and accompanying memorandum plaintiffs allege, *inter alia*, that, before and after the filing of this action in December 1984, "some [foster] children continue to receive brutal treatment in foster homes in which they are placed by the defendants," and "substantial numbers of children do not receive basic medical care and treatment for disease and disabilities." Plaintiffs contend that the continued acts and omissions by the defendants violate plaintiffs' rights under the Constitution and federal foster care law. This Court is asked to order the defendants to administer the Baltimore foster care system in compliance with federal statutory and constitutional law by enjoining plaintiffs from allowing inadequate homes to remain in the foster care system; failing to provide proper medical care; and by requiring prompt reporting of complaints of abuse and neglect to the appropriate authorities.

In defendants' response to plaintiffs' motion, defendants contend that they have acted vigorously to make substantial improvements in the Baltimore foster care; that plaintiffs cannot demonstrate that defendants acted with deliberate indifference to plaintiffs' rights; and that plaintiffs' proof reveals, at most, isolated incidents of past exposure to harm. Defendants support their opposition with thirteen documents purporting to demonstrate improvements they have made or are attempting to make in the foster care program.

The contentions advanced by plaintiffs concerning irreparable harm to foster children can be grouped into four categories:

(a) instances of neglect and abuse revealed through random case sampling;

(b) inadequate medical care;

(c) absence of protection afforded Code 517 children; and

(d) failure to undertake adequate and effective measures to address deficiencies in the system in the Baltimore City Foster Care Program revealed by the Harris Task Force in September 1984.

The Court will discuss plaintiffs' motion within the above categories.

(A)

*Instances of Neglect and Abuse Revealed Through Random Case Sampling*

Plaintiffs base their allegations of widespread, systematic omissions and failures by defendants, in part, on a study undertaken at their request by Dr. Trudy Festinger. Dr. Festinger chairs the Department of Research of the School of Social Work at New York University and has studied how caseworkers assess adoptive applicants, foster care agreements between departments of social services and foster parents nationally, and the effectiveness of court supervision of children in foster care. Dr. Festinger has published ten studies and lectured about foster care issues and research methodology. She serves on the New York State Board of Social Welfare.

Plaintiffs' study was accomplished through the review of individual foster care case records maintained by the defendants. Dr. Festinger reviewed files and the foster care policies of the Baltimore City Department of Social Services (BCDSS) to formulate the study. She also selected and trained casereaders and on-site supervisors and monitored the case reading.

The case reading focused on children who had been placed in foster care from January 1, 1983 to April 30, 1986. Two criteria determined which files were read: (1) the child could not have been placed in care out-of-state nor in a purchase care facility during the relevant time period; and (2) a child had to have been placed in a foster home for at least 60 days.

The four thousand (4,000) children represented by the Legal Aid Bureau in Child in Need of Assistance (CINA) proceedings were the universe from which the files to be read were selected.

Eight hundred and ninety seven (897) names were randomly selected from the universe. Through information from the Baltimore City Juvenile Circuit Court, the Attorney General, the Baltimore City Foster Care Review Board, BCDSS and the Legal Aid Bureau, each randomly drawn name was checked against the study criteria, approximately one-quarter met the criteria.

Plaintiffs' casereaders read 149 of the 224 cases that met the sampling criteria ($\frac{1}{4}$ of 897). Dr. Festinger concluded that her opinion could reasonably be based on that number.

Casereaders extracted only information found in the child's record. They recorded any documented concern, suspicion, or complaint of child maltreatment, casereader judgments were not recorded. The readers used a 69 page questionnaire containing 77 questions to be answered for each case. The casereading instruments provided uniform summaries of the readers' observations.

## Criticisms of Plaintiffs' Study

Defendants' witness Roger White, Ph.D., Associate Professor at John Hopkins School of Public Health in the Department of Maternal and Child Health, was qualified as an expert in statistics and the use of random sampling techniques in social sciences and child welfare studies. Dr. White's criticism of the plaintiffs' sampling methodology, included: (1) uncertainty as to the sampling frame; (2) the lack of an explanation why only 149 of the 230 "total end sample" were the basis for Dr. Festinger's conclusions; (3) the lack of operational definitions for such terms as "emotional abuse" and "sexual abuse"; (4) alleged inaccuracies in computation of random sample (*i.e.*, the sample should have been about 500 names not 230); and (5) concern about the reliability of the completed case reading instruments. After considering these criticisms, the Court finds that the plaintiffs' study is sufficiently sound for the purposes of this motion.

The sampling frame was foster children represented by the Legal Aid Bureau in CINA proceedings. The 149 cases used as a basis for Dr. Festinger's opinions had been analyzed in time to be utilized at the hearing. There is no evidence of significant statistical bias in the sample. Approximately 220 cases were to be examined because that is the number of cases that met the sample criteria.

With respect to "operational definitions", plaintiffs' casereaders merely recorded expressions of concern found in defendants' own records about each child.

As to the reliability of the completed instruments, the Court observes that during training every case was double-read and, after training, every tenth case was double-read. The Court's examination of the compiled instruments indicates that they were completed accurately. Moreover, defendants' expert recognizes Dr. Festinger as an expert in the field of social research and has acknowledged that she is "a very appropriately-acclaimed individual;" he has also cited Dr. Festinger in his own work.[1]

1. Defendants' expert undertook a study of the population of children in foster care in Balti-

In light of the soundness of plaintiffs' methodology, * * * the Court concludes that plaintiffs' study is a reliable evidentiary basis for the Court's findings.

### Results of Sampling

Of the 149 cases read, 42 indicated maltreatment in the foster home. From this finding, Dr. Festinger projected that 282 children per thousand might be maltreated. Dr. Festinger further commented that if only 14 of the 149 children had actually been maltreated, then 94 children per thousand were likely to have been maltreated during the study period.

As of the hearing, plaintiffs had conducted an intensive review of 18 of the 42 cases in which maltreatment was indicated during the most recent sampling period of May 1, 1985 through April 30, 1986.

Plaintiffs believe that the most probative indicators of the current status of the foster care program are these 18 cases. The 18 cases depict a pattern of physical, sexual and emotional abuses inflicted upon children in the custody of BCDSS.

The additional 24 cases are less recent and plaintiffs had not examined them in detail at the time of the hearing. For these additional 24 cases, plaintiffs introduced portions of the casereading instruments where maltreatment was recorded. The Court's review of the submitted documentation on these additional 24 children indicates that maltreatment is likely to have occurred in at least two-thirds of the cases.

### Instances of Maltreatment Not Developed By Random Sampling

Plaintiffs also offered evidence of maltreatment or neglect of 16 other children who came to the attention of the Legal Aid Bureau immediately before the filing of the motion for preliminary injunction. Largely uncontroverted testimony from treating physicians, some parents, and documentation submitted to the Court revealed children who had suffered continuous sexual and physical abuse or neglect in foster homes; children who had been placed in homes which defendants knew were inadequate; and cases where reports of abuse were not promptly or adequately investigated to prevent further placements of other children in those homes.

The tragic consequences of these deficiencies include sexual abuse of young girls by their foster fathers and a child who contracted gonorrhea of the throat after sexual abuse by the adult son of a foster parent in an unlicensed foster home.[2] In eight cases, defendants failed to assure that medical treatment prescribed by physicians and basic education were provided.

### Findings of Fact

The Court makes the following enumerated findings of fact as to plaintiffs' sampling and the 16 additional cases not developed through sampling:

1. Dr. Festinger is an expert in the field of social research methodology, foster care systems and child welfare policy.

2. The Court's review of the casereading instruments indicates that the casereading instruments were completed accurately.

3. Plaintiffs' random sampling study of children in the custody and care of defendants is a sufficient basis for determining whether systemic problems exist in the Baltimore foster care program.

more which was similar in many ways to that conducted by Dr. Festinger. In that study defendants expert examined the health status of foster children. The methodology used was a random sampling of foster care records from which were excluded the files for children who were placed in group or institutional care; children who remained in foster care for less than 30 days; and children whose case records could not be located. From those case records that met his sample criteria, defendants' expert concluded that scant information is kept as children's medical history; that a concerted effort needed to be made by BCDSS to insure that such information is available for use; that BCDSS needed to improve the adequacy of attention to health needs; and that there had to be sufficient personnel and budgetary resources necessary to attend to the health needs of children.

2. See Appendix 2 for additional summary of these 16 cases. [Editor's Note: Appendix 2 was omitted from publication.]

4. From the Court's review of the case records of the cited 18 children, it is evident that the expressed concerns about the conditions in the foster home and treatment of each child were well-founded in 15 cases. Indeed, in some cases the state of the foster home and treatment of the child were cause for grave concern.

5. The concerns expressed in the additional 24 cases were consistent with those of the 18 cases of most recent origin.

6. When the 18 cases of most recent origin are considered together with the additional 24 cases, the number of cases where expressed concerns were well founded very likely exceeds 30.

7. Where the concerns expressed are all well-founded and verified, the children were at risk of harm to their emotional and physical well being.

8. The number of children at risk out of the sample of 149 is sufficient to indicate that deficiencies exist throughout the foster care system as administered by the BCDSS.

9. The sample reveals that existing deficiencies include the failure to remove children from homes where physical and emotional abuse and neglect are threatened; the licensing of foster homes where foster parents are unable to care properly for the children; the granting of "exceptions" that allow homes to remain open when they are clearly inadequate or a risk to the children in them; the lack of appropriate numbers of satisfactory homes; and the over-reliance on physical evidence of abuse and questioning of children when abuse reports are investigated.

10. There is a great likelihood that many children in the foster care administered by BCDSS are at risk of suffering irreparable harm.

11. The additional 16 cases of abuse and neglect that were not developed through random sampling cannot be dismissed as "anecdotal." Indeed, while the Court does not rely on these cases in concluding that systemic deficiencies exist, these cases corroborate the deficiencies identified through plaintiff's study.

12. In most of these 16 cases, the situations placing these children at risk were not resolved or confirmed until two months before or after, the filing of plaintiffs' motion for a preliminary injunction.

### (B)

### *Inadequate Medical Care*

To support their allegations that foster care children receive inadequate health care, plaintiffs offered the testimony of two medical experts. Dr. Archie Golden is an expert in pediatrics and the administration of health programs for children, he has been the medical director of the Chesapeake Health Plan [3] ("CHP") for over six years. Dr. Charles Shubin is an expert in the field of pediatrics and the diagnosis of child abuse and neglect. Drs. Golden and Shubin have extensive experience treating foster care children in the custody of BCDSS.

The testimony of Drs. Shubin and Golden established that foster children were often abused or neglected in their natural homes and are generally in greater need of health care than other children. Foster children have numerous mental health or psycho-social problems and typically suffer from chronic illnesses; approximately 29% have eye problems; and some 28% of foster children do not have up-to-date immunizations.

Foster children often receive treatment for one episode of an illness in one facility and visit another for a subsequent episode of the same illness; thus, there is no continuity of information and records about the child's health treatment and a lower quality of care results.

### *Findings of Fact as to Medical Care*

The Court makes the following enumerated findings of fact about medical care provided foster care children:

---

**3.** The CHP was established as a private health maintenance organization in 1976 to provide for the health needs of foster children. A health maintenance organization for foster children was desirable because they usually have special health needs and a history of noncontinuous or episodic care.

1. Of the 2,600 to 2,800 children in BCDSS foster care today, 600 are enrolled in CHP. While most of the remaining children do not qualify for CHP enrollment, up to 400 children eligible to participate in CHP are not enrolled.

2. Although many children do not remain in foster care longer than 30 days, and there are no reliable statistics about the number of children who do not appear for medical appointments, it is apparent from the testimony of Drs. Shubin and Golden that a major problem in rendering health care to long term foster children is their failure to appear at medical appointments. CHP has articulated this concern to BCDSS, but BCDSS has failed to respond adequately.

3. Physicians treating foster children are often provided incomplete medical histories and must rely on the child being treated or an older sibling for such information.

4. The lack of an adequate medical history impairs effective medical treatment and exposes a foster child to such risks as redundant vaccinations or immunization with vaccines to which they may be allergic.

5. Sometimes natural parent hostility toward BCDSS increases the physician's ability to obtain a complete medical history, and physicians also encounter difficulties obtaining medical histories of children since entering foster care.

6. Defendants' present system of providing necessary medical care to foster children is inadequate to ensure continuous and informed treatment for those children.

### (C)

### *Absence of Protection Afforded Code 517 Children*

In 1983, defendants created the "Code 517" category of foster children. Although defendants are legally responsible for these children, they are placed in unlicensed homes. The caretakers in these homes, often relatives, are either unwilling to assume approved foster parent status or unable to meet foster home standards. Code 517 children are not provided services by the Division of Foster Care Services; their cases are not reviewed by the Foster Care Review Board; they are not subject to the review required by Federal law as are other foster children, there are no foster care payments for these children, and they are not considered by defendants to be in foster care. Suspected abuse or neglect in "Code 517" homes is not reported as foster home abuse. As of the commencement of the hearing, there were 312 children who were committed by the Courts to BCDSS and placed in the Code 517 category. No evidence of neglect or abuse was presented as to this class of children. While plaintiffs' suggestion of likely harm to these children from nonsupervision is credible, there is no basis for a finding of systemic abuse or neglect.

### (D)

### *The Harris Task Force and Purported Improvements*

Sometime before filing suit in 1984, plaintiffs supplied defendants with a copy of the original complaint in this case. In response, defendants established the "Harris Task Force" to conduct a review of the foster care system in Baltimore City. The Task Force conducted interviews of several senior staff members at BCDSS. The Task Force also conducted a random review of 15 foster care cases including ten involving reports of suspected abuse. Based on these interviews and this random sample, the Task Force identified a number of "systematic problems" and suggested corrective action.[4]

Defendants purport to have undertaken a number of improvements in the Baltimore foster care system based, in part, on the findings of the Harris Task Force.

The Harris Task Force found the following "major systematic problems" in the

---

**4.** Although defendants attack the validity of the methodology used by plaintiffs in their random sampling, defendants do not take issue with the Harris Task Force's findings of systemic deficiencies based on a review of fifteen foster care cases.

BCDSS foster care program (1) the purpose of family care was not well-defined leading, for example, to the placement in foster homes of children whose needs could not be met within a private home setting; (2) payments to foster families were unrealistically low; (3) there were not enough homes, and there was "no concerted effort to recruit foster homes"; (4) licensing of foster homes was inadequate: a lower standard is applied to restricted homes than regular homes, and licensing is based on inadequate information; (5) "serious gaps" in the training provided to foster families, BCDSS case workers and their supervisors; (6) BCDSS files contained inadequate information about medical histories, foster parents and education; (7) the "agency's organizational structure is conducive to chaos"; (8) some caseworkers and supervisors lacked necessary training; (9) more strict enforcement of policies requiring investigation of abuse and neglect complaints was necessary; (10) the Department of Human Resources (DHR) needed to improve monitoring of BCDSS to ensure the adequacy of services; (11) substantial increases in staff size were necessary to reduce ratios of cases handled by foster care workers; (12) poor morale among BCDSS staff; (13) need for a pre-placement diagnostic facility to place children on an emergency basis and identify their problems; (14) need for an automated system to monitor foster care cases; (15) a lack of coordination between BCDSS and agencies outside the city when children were placed outside the city; (16) a policy classification was required for nonlegally responsible custodians who requested a foster care license or payments; and (17) poor relationships among BCDSS caseworkers, BCDSS Legal Services, and the Juvenile Courts with respect to child placement decisions. The findings of the report are uncontroverted.

However, defendants contend that they have attempted to improve foster care in Baltimore. Among the major efforts defendants have undertaken are (1) review of all BCDSS foster homes; (2) training for foster care workers; (3) recruitment of new foster parents; (4) increases in foster care board rates; (5) training of foster parents; (6) additional foster care staff to reduce the ratios of caseworker to children to 1 to 20; (7) clarification of lines of authority within the DSS; (8) recruitment of better qualified social workers; (9) medical screening of all children before their placement; (10) development and distribution of a foster care manual and revised policies; and (11) initiation of an intensive family services program.

### Findings of Fact as to Purported Improvements Undertaken Pursuant to the Harris Task Force

The Court makes the following enumerated findings of fact as to the significance and effectiveness of defendants' purported improvements undertaken pursuant to the Harris Task Force:

1. Many of the most essential of defendants' efforts to improve foster care in Baltimore have been incomplete and ineffective.

2. As recommended by the Harris Task Force, defendants undertook a review of all BCDSS foster homes. This review, defendants contend, "was initiated to determine whether foster children were at risk in their placements." As a result of that review, 444 homes were closed in 1985, and 189 were closed in 1986. Defendants contend that as a result of the closings, the pool of BCDSS foster homes is safer now than at the time of the Harris Task Force report. However, during cross-examination of Secretary Massinga, it was established that the homes closed were primarily those of elderly foster parents who no longer wanted to be registered as foster homes and no longer had foster children in their homes.

3. During 1985 and 1986, only 53 additional regular or unrestricted foster homes were recruited and opened by defendants. Furthermore, when the hearing commenced, defendants had only one person working solely on recruitment of foster homes.

4. The "Intensive Family Services Unit" at BCDSS, set forth as a recent improvement in foster care, was disbanded in 1986.

5. The Harris Task Force recommended that foster care workers receive training.

Defendants have proffered a document entitled "Training Sessions for BCDSS Foster Care Workers: 1984–1986." During cross-examination it was revealed that this document was not what it purported to be, and defendants were unable to offer any reliable evidence of training provided to foster care workers.

6. The Harris Task Force recommended that DHR "improve its foster care quality control review system." DSS has devised a system for case record reviews to evaluate the quality of services provided to foster care children. However, from January until October, 1986, no quality assurance reviews of foster care records took place.

7. At the hearing defendants highlighted several policies implemented to protect children in foster care; the plaintiffs presented evidence that those policies are violated. Violated were the policies requiring that an investigation of an abuse report be commenced within 24 hours of its receipt; that no further placements be made in a foster home that is the subject of a report of suspected abuse until completion of an investigation; and that all children be removed from a home where a finding of abuse is "indicated."

8. Defendants have yet to reduce the ratio of workers to children to 1 to 20.

9. Given defendants' incomplete and ineffective responses to the systemic problems identified by the Harris Task Force in 1984, it is likely that these problems still exist and that significant numbers of foster children are at risk of irreparable physical and emotional harm.

10. Given defendants' ineffective and incomplete responses to the problems identified by the Harris Task Force and the ineffective implementation of their own child protection policies, it cannot be assumed that the recent increased funding of some programs will resolve systemic foster care problems.

*Discussion of the Legal Standard for Determining the Propriety of Preliminary Injunctive Relief*

The standard for determining whether a party is entitled to preliminary injunctive relief is the "balance-of-hardship" test of *Blackwelder Furniture Co. v. Seilig,* 550 F.2d 189, 196 (4th Cir.1977). "This test requires a 'flexible interplay' among four factors: the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied; the likelihood of harm to the defendant if the requested relief is granted; the likelihood that the plaintiff will succeed on the merits; and the public interest." *Federal Leasing v. Underwriters at Lloyd's,* 650 F.2d 495, 499 (4th Cir.1981).

Under *Blackwelder* the first consideration is the "likelihood of irreparable harm to the plaintiff, as balanced against the likelihood of harm to the defendant." *Federal Leasing,* 650 F.2d at 499 (*citing Blackwelder,* 550 F.2d at 196). "If that balance is struck in favor of plaintiff, it is enough that grave or serious questions are presented; and plaintiff need not show likelihood of success." *Blackwelder,* 550 F.2d at 196. *See also Merrill Lynch, Pierce, Fenner & Smith v. Bradley,* 756 F.2d 1048, 1054–1055 (4th Cir.1985); *Federal Leasing,* 650 F.2d at 499; *Johnson v. Bergland,* 586 F.2d 993, 995 (4th Cir.1978). The public interest should always be considered. *Blackwelder,* 550 F.2d at 196.

The violation of a constitutional right constitutes *per se* irreparable injury. *Johnson v. Bergland, supra,* 586 F.2d at 995. Accordingly, "if plaintiffs are able to demonstrate a loss of constitutional rights, they will have met the irreparable injury requirement." *Greater Baltimore Bd. of Realtors v. Hughes,* 596 F.Supp. 906, 924 (D.Md.1984). *See also* 11 C. Wright and A. Miller, *Federal Practice and Procedure,* § 2948 (1973).

In *Lynch v. King,* 550 F.Supp. 325 (D.Mass.1982), *aff'd sub nom., Lynch v. Dukakis,* 719 F.2d 504 (1st Cir.1983) plaintiffs foster care children brought a class action alleging that Massachusetts' foster care system violated the due process clause of the Fourteenth Amendment, the Social Security Act, 42 U.S.C. §§ 601 *et seq.* and regulations promulgated by the Secretary of the Department of Human Resources.

Although plaintiffs brought their action in 1978 plaintiffs did not move for a preliminary injunction until 1981.

The evidence in *Lynch* addressed defendant's compliance with § 608(f) of Title IV–A of the Social Security Act, § 671(a) of Title IV–E and § 627(a) of Title IV–B which require the development and implementation of a case plan for each child to assure appropriate care and a periodic review of the status of each child to determine the appropriateness of placements. The Court found the evidence sufficient to establish noncompliance; however, it acknowledged "certain weaknesses" in plaintiffs' proof. 550 F.Supp. at 337. In granting plaintiffs a preliminary injunction the Court stated that "[t]hese flaws are not fatal to plaintiffs' motion for preliminary injunction," because the defendants, "as the parties having greater access to and control of relevant evidence, have offered little proof to rebut the powerful inference that case plans and periodic review are not being provided in significant numbers of cases involving children in foster care." *Id.* The Court also found that defendants' apparent failure to comply with the Social Security Act was likely to cause plaintiffs irreparable harm and observed "[t]he physical and emotional damage threatening these children, should it occur, could never be undone." 550 F.Supp. at 338. In balancing this harm against that likely to be suffered by the defendants should an injunction be granted, the Court quoted defendants' characterization of their hardship as follows:

> The defendants' interest consists in freedom from a burdensome judicial order that will disrupt the management of [DSS], including delivery of the very services plaintiffs seek. For a court to intrude in the present case is to risk demoralizing agency personnel and engendering cynicism in an improving administration; to substitute judicial judgment for that of trained professionals and a legalistic atmosphere for a therapeutic one; to risk a confrontation with the state legislature; to risk stripping funds from crucial programs in order to pay for others receiving judicial attention; to risk

forcing the state to give up badly needed federal funds, rather than comply with a far more costly judicial order.

*Id.* at 339.

In weighing those concerns, the Court agreed that "it is essential for federal courts to be ever sensitive to these considerations" and that "[e]very federal judge must be concerned about the prospect of issuing relief that unduly hampers the day-to-day administration of a state agency." *Id.* Nevertheless, "concerns of federalism ... are present in any case in which a class of plaintiffs seeks the aid of a federal court in securing state compliance with federal law." *Id.* In concluding that concerns of federalism were outweighed by the prospect of harm to the foster children, the court held that the need for judicial sensitivity to these concerns does not justify abdication of judicial responsibility. *Id.*

> Here, Congress—and not any court—created requirements it thought essential to protect the welfare of foster children. The Commonwealth voluntarily undertook to fulfill those requirements as a condition of receiving federal money. Plaintiffs filed suit to enforce those requirements because they believed it would serve their best interests to do so.... In granting preliminary relief to plaintiffs, this court does not substitute its judgment for that of state officials. It instead gives realization to the will of Congress and protection requested by those Congress intended to protect. Indeed, if the court chose to deny relief on the grounds urged by defendants, that denial would reflect a judgment that the wisdom of Congress and desires of plaintiffs should go unheeded because the Commonwealth knows better than any of them how to serve plaintiffs' interests. This court is not free to make such a judgment.

550 F.Supp. at 339–340. Concerning the impact of a preliminary injunction on the public interest the District Judge added:

> Congress imposed these requirements in the belief that they were essential to assure the proper care of children in the foster care system. The evidence con-

firms that failure to satisfy the Congressional conditions may result in grave harm to foster children. Guided by the Congressional determination of the public interest in this context, I conclude that the public interest will be furthered by awarding a remedy calculated to ensure that Massachusetts' foster care system conforms to the dictates of the Social Security Act.

550 F.Supp. at 340.

As preliminary injunctive relief, the Court ordered that the caseload ratio of foster care workers to children be reduced to 1:20; that each child's case receive a periodic review every six months; that a written case plan be formulated for each child; and that a foster care worker be assigned to each case within 24 hours of its receipt. *Id.* at 355–357. Failure to comply with the order would result in a termination of federal funds.

In the instant case, the defendants contend that their interests will be impaired by a preliminary injunction; however, none of these interests outweighs the harm likely to befall plaintiffs should no injunction be issued. Defendants argue that the interests underlying principles of federalism preclude the imposition of an injunction. *Bloodgood v. Garraghty,* 783 F.2d 470, 475 (4th Cir.1986), is cited for the proposition that it is an abuse of discretion for a federal court to grant injunctive relief against state officials who have not been found to have violated the law or have shown any intention to violate the law. In addition, defendants argue that the interests of the Maryland state courts require this Court to abstain from deciding the motion for preliminary injunction and cite *Pennzoil Co. v. Texaco,* 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed. 2d 1 (1987); *Moore v. Sims,* 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979); *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); and *Cox v. Planning Dist. I Community Mental, Etc.,* 669 F.2d 940 (4th Cir.1982).

This Court agrees that sensitivity to the concerns of federalism are required when a federal court considers enjoining state officials. To this end, any relief granted should be tailored to correct ongoing harm in a way that is not overly intrusive. In granting injunctive relief this Court does not substitute its will for that of state officials. Rather, the Court seeks to enforce the will of Congress as expressed in the foster care provisions of the Social Security Act and to protect plaintiffs' constitutional rights.

Plaintiffs have made a showing of threatened irreparable injury. Therefore, the Fourth Circuit's holding in *Bloodgood* does not bar an injunction in the instant case; neither is relief barred by the abstention doctrine. Abstention to accommodate adjudication by the state courts "is the exception, not the rule." *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976). Abstention is appropriate when a question of federal constitutional law may be mooted by a state court determination of state law, *Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941); where unsettled questions of state law affecting important state policy concerns are presented and federal jurisdiction would impair the establishment of a consistent policy, *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943); and where federal jurisdiction is sought to restrain a state court proceeding. *Younger v. Harris, supra.*

Here the Court seeks to enforce a federal statute embodying a federal policy to which defendants committed themselves through their acceptance of federal funds. Also at issue is the right to protection guaranteed plaintiffs by the federal constitution. There are no unsettled questions of state law before the Court, nor is any pending state court proceeding to be restrained. Moreover, it is federal policy which is not being served. This case is, therefore, distinguishable from cases where abstention is appropriate. *See, e.g., Pennzoil Co. v. Texaco, supra* (federal injunction directly interfered with the execution of a state judgment and challenged the process by which the judgment was obtained in state court); *Moore v. Sims, supra* (federal court should have abstained in light of a

pending state court proceeding on the matter); *Younger v. Harris, supra* (federal court improperly enjoined a state court proceeding); *Cox, supra* (abstention appropriate where unsettled question of state law was at issue).

Although the injunction granted herein might not be extremely long in duration, the harm threatening foster children and the express will of Congress that proper care be extended to these children, indicate that the public interest would be served by the granting of a preliminary injunction.[5]

Plaintiffs have offered sufficient evidence to establish the existence of serious systemic deficiencies in the Baltimore foster care system. These deficiencies include the failure to implement policies to protect children in foster care; the lack of an effective effort to recruit new foster homes; the licensing of questionable homes; the granting of exceptions allowing homes that should be closed to remain open; and the incomplete medical histories of children in foster care. As a result of these deficiencies, foster children are threatened with and are likely to suffer severe physical and emotional injury. Furthermore, plaintiffs' constitutional right to protection while in defendants' custody is in jeopardy.[6] Accordingly, plaintiffs are entitled to a preliminary injunction. *Blackwelder, supra*, at 196.

*Likelihood of Prevailing on the Merits*

Although the Court is required to inquire no further, the issues before the Court are of such magnitude and public importance that the Court will address the plaintiffs' likelihood of success on the merits.

Plaintiffs have stated claims under Title IV–B and IV–E of the Social Security Act, 42 U.S.C. §§ 620 *et seq.* and 670 *et seq.* The defendants have accepted funds under these programs and do not dispute that they are obligated to adhere to funding requirements.

The federal foster care and adoption assistance program, Title IV–E, requires that defendants "be responsible for establishing and maintaining standards for foster family homes ... which are reasonably in accord with recommended standards of national organizations concerned with standards for such ... homes." 42 U.S.C. § 671(a)(10). These should include "standards relat[ing] to admission policies, safety, sanitation, and protection of civil rights...." *Id.*

Title IV–E and IV–B require defendants to provide for the development of a case plan for each child for the purpose of "assuring that the child receives proper care" and "that services are provided to the parents, child, and foster parents in order to improve the conditions in the parents' home...." 42 U.S.C. § 675(1). The term "proper care" as used in the Social Security Act has been interpreted to include necessary medical and educational services. *See, Gary W. v. Louisiana*, 437 F.Supp. 1209 (E.D.La.1976). Titles IV–E and IV–B

---

**5.** At the hearing, defendants also contended that a preliminary injunction was inappropriate because trial of this matter is scheduled for November. The trial date is, however, tentative at best. Neither defendants nor plaintiffs were able to complete discovery within the time allowed by the current Scheduling Order in this case. In requesting an extension of the discovery deadline, defendants contend that they are unable to commence discovery until plaintiffs' discovery is completed. Following the completion of discovery, a period for filing and ruling on additional motions is anticipated.

In the unlikely event that trial is able to go forward in November, it would last all month. The need for post-trial briefs on an issue of this gravity might consume December, and, because of the voluminous amounts of documents likely to be introduced into evidence, the Court would probably require until late April or early May to issue a ruling.

Defendants suggest that a preliminary injunction is unnecessary because policies and programs which they are implementing should satisfy plaintiffs' concerns. However, this argument carries little weight in light of defendants' failure to effectively implement current programs and policies.

**6.** Plaintiffs have demonstrated systemic deficiencies in the foster care system with direct personal injuries traceable to defendants' conduct. Accordingly, the Court need not address defendants' reliance on *Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) for the proposition that no real controversy exists, and that plaintiffs here prosecute a mere "generalized grievance."

also require a case review system to determine the "appropriateness of the placement." 42 U.S.C. § 675(5)(B).

Systemic problems in the Baltimore foster care program have been revealed by the findings of plaintiffs' study and the Harris Task Force. Given the magnitude of these problems as revealed by the evidence received during the two week hearing, it appears unlikely that defendants will be able to prove they are in compliance with Title IV–E and IV–B.

Plaintiffs also claim that their Fourteenth Amendment right to protection is being violated by defendants. In *Jensen v. Conrad,* 747 F.2d 185 (4th Cir.1984), *cert. denied,* 470 U.S. 1052, 105 S.Ct. 1754, 84 L.Ed.2d 818 (1985), the Court provided guidance for determining whether an individual has a "special relationship" with the state such that a constitutional duty of protection exists. Specifically, the Court enumerated three considerations: "(1) Whether the victim or the perpetrator was in legal custody at the time of the incident, or had been in legal custody prior to the incident ... (2) Whether the state has expressly stated its desire to provide affirmative protection to a particular class or specific individuals ... [and] (3) Whether the state knew of the claimants' plight...." 747 F.2d at 194–195. n. 11.

Applying these factors, the Court finds plaintiffs have demonstrated the existence of a "special relationship" with defendants such that plaintiffs are owed an affirmative duty of protection by defendants. Here defendants undertook to provide plaintiffs with proper care and defendants have known, or had reason to know, of systemic deficiencies since the Harris Task Force report. Most importantly, plaintiffs are vulnerable children in the custody of defendants.

Children in similar circumstances have been held to have a right to protection. In *Estate of Bailey by Oare v. County of York,* 768 F.2d 503 (3d Cir.1985), a civil rights complaint was brought against a county welfare agency by the father of a five-year-old girl who was beaten to death by her mother and mother's boyfriend.

The welfare agency had previously determined that the child had been abused and agreed to return the child to the mother only upon the condition that the boyfriend be denied access to the child. The complaint alleged that the agency returned the child to the mother without conducting an independent investigation to determine whether the child's mother and the mother's boyfriend were living together. 768 F.2d at 505. Following the *Jensen* analysis, the Court determined that a "special relationship" had existed between the child and the agency sufficient to state a claim based on a duty to protect. *Id.* at 510–511. *See also Doe v. New York City Department of Social Services,* 649 F.2d 134 (2nd Cir.1981), *cert. denied,* 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983) (Court held that an agency that placed a child in foster care could be liable for the child's sexual abuse by her foster parent if the agency had failed to supervise adequately the child's placement.).

Having determined that plaintiffs have a "special relationship" with defendants such that an affirmative duty to protect exists, this Court must determine whether plaintiffs are required to show that defendants have acted with "deliberate indifference" to that right. Regardless of whether "deliberate indifference" must be proven, the evidence in this case shows that, at least since the Harris Task Force report, defendants have been aware of serious deficiencies in the system and their tragic consequences. For example, the evidence shows that one major problem with the system is the lack of satisfactory foster homes. Yet as of the hearing, only one person worked solely on recruiting homes for BCDSS. Moreover, only 53 new nonrestrictive homes were opened in 1985 and 1986. In order to compensate for the lack of homes, defendants have placed children in homes that are unsatisfactory and are reluctant to close homes where maltreatment is either suspected or confirmed.

The defendants' duty to protect and the systemic nature of the BCDSS failure to

perform that duty create a clear likelihood of plaintiffs' success on the merits.

\* \* \* \* \* \*

Therefore, it is this 27th day of July, 1987, by the United States District Court for the District of Maryland,

ORDERED:

As to plaintiff's motion for a preliminary injunction,

1. That plaintiff's motion for a preliminary injunction BE, and the same hereby IS, GRANTED.

2. That defendants shall submit to the Court within 20 days, a plan for a review of each foster home in which a report of maltreatment has been made and in which foster children continue to reside to ensure that such home meets licensing standards reasonably in accord with those recommended by nationally recognized professional organizations.

3. That defendants shall monitor each child in a DSS foster family home by, at least, monthly visits to the child to ensure that the child is receiving proper care and the foster home continues to meet licensing standards. Where there has been a report of maltreatment of the child and the child remains in the home, the child shall be visited at least weekly.

4. That defendants shall assign sufficient staff and resources to ensure that available medical histories are obtained and provided to children's medical and other service providers, including foster parents, to ensure that appropriate medical preventive care, services, treatment and diagnoses and other care are promptly and appropriately provided in accord with approved medical standards.

5. That defendants shall provide a written copy of any complaint of maltreatment of a foster child to the juvenile court and the child's attorney within five days of its receipt and shall provide to the juvenile court and the child's attorney a written report of any action taken on the complaint within five days of its disposition by the agency.

(s) Joseph C. Howard
United States District Judge

DATED: July 27, 1987